UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Tasha Nelson,

      Plaintiff,

              Case No. 2:08-cv-549

v.

              Judge Michael H. Watson

American Power and Light, et al.,

      Defendants.

## OPINION AND ORDER

This case arises from the filing of two eviction actions in a state court against plaintiff Tasha Nelson, who, at the time, was a renter and was receiving a Section 8 housing subsidy.  In her second amended complaint, Ms. Nelson asserts that defendant American Power and Light ("APL"), which filed the actions in the name of and with the permission of Ms. Nelson's landlord, defendant Green Eagle, LLC ("Green Eagle"), violated the Fair Debt Collection Practices Act, the Ohio Consumer Sales Practices Act, and duties imposed by Ohio common law.  All of her claims arise out of disputes with APL over her electric bill.  She has asserted similar claims against Green Eagle.

APL responded to the second amended complaint in two ways.  First, it moved to dismiss the complaint under Federal Rule of Civil Pprocedure 12(b)(6).  Second, it filed an amended third-party complaint against Realty Executives Central ("REC"), a company which acted as the leasing agent for Green Eagle.  REC, in turn, has moved to dismiss the amended third-party complaint under Rule 12(b)(6).  Both motions to dismiss are fully briefed.  For the following reasons, APL's motion to dismiss will be granted in part and denied in part, and REC's motion to dismiss will be granted.

I.

A claim survives a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (internal citations omitted).

A court must also "construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). In doing so, however, plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 129 S. Ct. at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007). "[A] naked assertion . . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility . . . ." *Twombly*, 550 U.S. at 557. Thus, "something beyond the mere possibility of [relief] must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *Id.* at 557–58 (internal citations omitted).

## II.

The Court will begin by addressing APL's motion to dismiss. The second amended complaint pleads a number of specific facts that relate to APL's conduct. Although the Court will focus on the facts relating to each of Ms. Nelson's legal claims when it discusses those claims individually, the following facts, all of which the Court must presume to be true, are common to all of the legal claims asserted.

Ms. Nelson began renting from Green Eagle in June 2004. She renewed her lease by way of an agreement dated May 30, 2006. A copy of that lease agreement is attached to the second amended complaint. The lease identifies REC as the landlord.

One provision of the lease agreement is central to this dispute: "The Lessee shall provide and maintain the following utilities: **Electric and water**." The lease also describes, in paragraph two, the landlord's ability to give the tenant an eviction notice. Specifically, it sets forth the amount of the monthly rental and its due date, and provides that if the rent is not received by the eighth day of the month, a three-day eviction notice will be served. The only other provision of the lease which specifically mentions eviction is Paragraph 20, which states that "Lessor shall not evict the Lessee unless the Lessor complies with the requirements of local law." There is no specific language in the lease stating that the tenant may be evicted for failing timely to pay electric or water bills.

Apparently, at the time relevant to this case, the only electric provider with whom tenants of Ms. Nelson's apartment building could contract was APL. In 2003, APL entered into a "Tenant Billing and Electrical Equipment Service Agreement" with Triangle Properties, Inc. ("Triangle"), then the owner of Ms. Nelson's apartment

building, which allowed APL to bill tenants "for the portion of their rent that covers electrical service costs." The agreement also allowed APL to bill each tenant for "a reasonable allocation of common area usage, which will be added to the tenant's metered unit usage." It also allowed APL to request authority to bring an eviction action against any tenant whose account was sixty or more days past due. A sample lease agreement was attached to this agreement. That sample agreement, unlike the lease which Ms. Nelson signed, stated that the "[f]ailure to timely pay for any utility bills shall be construed as a breach of this lease and treated as such." It also advised the tenant that he or she would be billed for a share of common power usage. That language also does not appear in Ms. Nelson's lease. The terms of the "Tenant Billing and Electrical Equipment Service Agreement" were not disclosed to Ms. Nelson when she signed her lease, and she was unaware of them.

Ms. Nelson contacted APL to arrange for electric service to her apartment. The parties did not enter into any type of written service agreement. APL sent written bills, however. One of the terms on the written bill stated that if Ms. Nelson's payment was late, she would be assessed a $5.00 late fee. Another stated that the "Electric Power Charge" for which Ms. Nelson was billed consisted of "[t]he unit measure for the electricity you use." None of the bills reflected that Ms. Nelson was being billed for common area electrical usage. Rather, each bill indicated that the amount of electricity for which Ms. Nelson was being billed was determined based on the readings of a particular meter, identified by number. Copies of some of her electric bills are attached to APL's motion to dismiss.

In October 2007, APL filed an eviction action in the Franklin County, Ohio

Municipal Court naming Ms. Nelson as a defendant.  The complaint, brought in the name of REC, alleged that "[t]here is due and owing to Plaintiffs (sic) under the lease the sum of $172.58 for non-payment of electric, which sum Plaintiffs (sic) demanded by Defendants have not paid" and that "Defendants have breached their obligations as described hereinabove in that Defendants have not paid their electric on time."  In early 2008, an almost identical forcible entry and detainer action was filed in the same court, with the only difference being the amount of Ms. Nelson's unpaid electric bill, which was $122.22.  According to the complaint, Ms. Nelson was receiving a full rent subsidy at that time, so she was current on her lease payments.

Finally, according to the complaint, at least some of the charges shown on APL's bills to Ms. Nelson were for common area electric usage, court costs, attorneys' fees, and other "non-contractual charges," all of which would appear on her bill as a "previous balance."  (Second Am. Compl. ¶ 27.)  In particular, Ms. Nelson claims that $226.00 in legal costs was added to her January, 2008 electric bill.  She also alleges that APL routinely billed her for late charges in excess of the $5.00 late fee referred to on her bill, charging her a late fee of 5% instead.  The bills attached to APL's motion appear to confirm this allegation by indicating, on each bill, the amount due if payment was not made by the due date.  In each instance, the amount by which the bill would increase if not timely paid exceeded $5.00, and was, instead, 5% of the balance due.  Those bills also confirm that the bill for which payment was due on October 15, 2007 showed a balance due, if paid late, of $299.93, but the next month's bill showed the past due amount to be $536.18, with no explanation given of why the amount had increased by $236.25.  Ms. Nelson paid that additional charge.  The same thing occurred on the bills

for which payment was due on December 15, 2007 and January 15, 2008, with the prior balance increasing from $176.77 to $401.77, again without explanation on the bill itself for this increase. Because the Court must accept as true the well-pleaded factual allegations in the complaint, it will assume that both of these increases represent court costs or attorneys' fees. Ms. Nelson's lease with REC is silent on the assessment of such fees upon the filing of an eviction action. The agreement between Triangle and APL says that in the event of an eviction commenced by APL, "APL shall bear the administrative, legal and court expenses for such eviction action." (Second Am. Compl. Ex. B.)

### III.

Ms. Nelson pleads her first cause of action under the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.* Although she pleads her FDCPA claims in a single count, she alleges multiple violations of the Act, including violations of §§ 1692e(2)(A), 1692e(2)(B), 1692e(5), 1692e(10), and 1692f(1). The Court will examine each of these alleged violations separately, but must first resolve a threshold question raised by APL's motion to dismiss, which is whether APL is a "debt collector" as defined in 15 U.S.C. §1692a(6), If not, all of Ms. Nelson's FDCPA claims would fail, because each of the statutory sections she relies on prohibit actions taken by "debt collectors." *See Wadlington v. Credit Acceptance Corp.*, 76 F.3d 103, 105 (6th Cir. 1996) ("statutory liability is limited to debt collectors . . . .").

### A.

Any discussion of the meaning of a statutorily-defined term begins with the statutory definition. "Debt collector" is defined in §1692a(6) as "any person who uses

any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts" or any person "who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). It also includes "any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts." *Id.* The term "creditor" is defined in §1692a(4) to mean "any person . . . to whom a debt is owed . . . ." APL acknowledges that it was a creditor because Ms. Nelson owed it a debt, *i.e.* the past due balances on her electric bills. However, APL argues that at least some of the actions described in the first count of the complaint do not constitute the actions of a debt collector.

The complaint alleges that on two occasions, APL, using only its own resources, caused eviction actions in the name of REC to be filed in the Franklin County Municipal Court. It also pleads that the purpose of those actions was to pressure Ms. Nelson into paying the balance allegedly due to APL on her electric bills. The Court must accept these facts as true for purposes of ruling on APL's motion. Under Ms. Nelson's theory of liability, which is premised upon what the "least sophisticated consumer" would believe to be true, APL's use of REC's name to collect a debt owed to APL would lead such a consumer to believe that APL used a name other than its own in an effort to collect a debt owed to APL, and therefore brought APL within the statutory definition of "debt collector" as set out above. As the Court reads both APL's opening memorandum and its reply memorandum, APL does not dispute, for purposes of the motion to dismiss, that it could be considered a debt collector when it filed the eviction actions in

REC's name. (See APL's Reply Mem. (Doc. 70) 3 n.9.) Rather, as to that claim, it simply asserts that Ms. Nelson has not pleaded any violation of the substantive provisions of the FDCPA. It focuses its "debt collector" argument on any violations that appear to be premised on the actions it took with regard to the bills sent to Ms. Nelson, all of which were sent by APL in its own name. Without arguing the substantive point about whether it had the right to bill Ms. Nelson for "non-contractual amounts" such as common area usage or attorneys' fees and costs, or for late fees in excess of $5.00, it claims that it was simply acting for itself when it sent bills containing these charges, and could not have violated the FDCPA by doing so.

Ms. Nelson's response to this argument is that APL's activities cannot be parsed out into billing activities, on the one hand, and the filing of eviction actions on the other. Rather, she contends that the filing of eviction actions is an activity broad enough to encompass threatening to bring litigation, and that APL's actions in issuing three-day notices (a precursor to litigation) and refusing to accept payments that did not include payment for non-contractual fees, thus enabling it to proceed to file an eviction action in order to collect such fees, are part and parcel of a single course of debt collection. Since one part of that course of action qualifies APL as a debt collector, Ms. Nelson reasons, all of the actions relating to it can also be considered to be the activities of a debt collector. Ms. Nelson cites to no case which has adopted this expansive a reading of the FDCPA, and the case law does not support such a broad reading of the statute.

When faced with the issue of whether a creditor has also acted as a debt collector, courts typically examine each alleged action separately to determine if, as to that phase of the collection activity, the creditor had stepped out of the role of collecting

its own debts in its own name, and triggered the application of the FDCPA by using a different name as part of the collection effort.  *See, e.g., Gutierrez v. AT&T Broadband, LLC*, 382 F.3d 725, 730 (7th Cir. 2004) (analyzing different phases of the collection process separately).  Further, it would be inconsistent with Congress' effort to regulate the debt collection industry, and not the actions of creditors, through the FDCPA to transform a creditor into a debt collector for all purposes simply because, on one occasion, the creditor used a third party's name in its collection efforts.  As a general matter, the drafters of the Act "recognized that the activities of creditors seeking to collect their own debts are restrained by the creditors' desire to retain their good will with consumers" and that their actions, unless taken under a false name, did not require Congressional regulation.  *See Carlson v. Long Island Jewish Medical Center*, 378 F.Supp. 2d 128, 131 (E.D.N.Y. 2005).  Thus, so long as APL was using its own name on any collection efforts (to the extent that sending out bills with past due amounts shown represented collection efforts), it was not acting as a debt collector and its activities did not fall within the scope of those which Congress has sought to regulate. It is only when a creditor steps outside that role by using "a name other than his own" that "the motivation to protect the good will in his own name is absent and the likelihood for abusive debt collections practices returns."  *Sokolski v. Trans Union Corp.*, 53 F.Supp. 2d 307, 312 (E.D.N.Y. 1999).  Consequently, the Court concludes that the only activities APL engaged in that could subject it to liability under the FDCPA as a "debt collector" are the filing of eviction actions in REC's name as an effort to collect debs due to APL.

**B.**

Ms. Nelson alleges that the filing of the two eviction actions at issue violated 15 U.S.C. §§ 1692e(2)(A) and 1692e(5) because, by filing them, APL was "representing to Ms. Nelson that it had the legal status and capacity to evict her for late payment of her electric bill when in fact it had no independent legal standing to evict Ms. Nelson." (Second Am. Compl. ¶ 26.) She also claims that the "routine use of [REC]'s name to file eviction actions based on the late payment of electric bills containing numerous non-contractual fees is a deceptive means to collect a debt, and thus violates 15 U.S.C. §1692e(10)." (Id. ¶ 34.) The cited sections of the FDCPA prohibit, respectively, "the false representation of . . . the character, amount, or legal status of any debt," "the threat to take any action that cannot legally be taken or that is not intended to be taken," and "the use of any false representation or deceptive means to collect or attempt to collect any debt . . . ."

In disputing that these allegations state a claim for relief under the FDCPA, APL argues, first, that nothing in the complaints filed in the eviction actions represents that APL actually had the ability to evict Ms. Nelson. Rather, REC, which does have the legal capacity to file an eviction action against tenants of Ms. Nelson's apartment building, was named as the party seeking to evict her, and there is nothing false about that representation. Second, APL argues that the eviction actions were not false and misleading efforts to collect a debt because under Ohio law, a landlord is allowed to evict a tenant for breach of the lease, nonpayment of the electric bills was a breach of the lease, and each action correctly represented the amount owed on the bills. The Court agrees with the first argument but, at least in the context of the motion to dismiss,

not the second.

APL is correct that REC, as agent for the owner of Ms. Nelson's apartment building and the party with whom she signed a lease, always had the legal right to file an eviction action against her. Whether it also used its own resources to do so, or granted that right to APL under certain limited circumstances, is irrelevant to the issue of whether the complaint that was filed would have deceived the least sophisticated consumer about who it was that filed the case, or who had the legal right to take such action. There is nothing about the eviction complaint itself that can be found to be deceptive on these issues. Thus, Ms. Nelson's first argument fails.

Ms. Nelson's second argument, which is based primarily upon § 1692e(10), is that the eviction complaint contains false information, particularly that an eviction was authorized simply because she was late in her payments to APL and that the amount of the debt she owed included fees that she was not contractually required to pay. APL responds that, under Ohio Rev. Code § 1923.02(A)(9), a landlord is entitled to commence eviction proceedings for a breach of the lease, that nonpayment of her electric bill was a breach of Ms. Nelson's lease, and that the amount contained in each complaint was the amount Ms. Nelson actually owed for electric service. At this stage of the case, however, Ms. Nelson has adequately pleaded that each of these three statements is not necessarily correct, and that a consumer could well have been deceived about each of them based on the eviction complaints that were filed.

The potential for a statement made during the course of debt collection activities to be false or misleading is judged by an objective standard, known as the "least sophisticated consumer" standard. *See Hartman v. Great Seneca Fin. Corp.*, 569 F.3d

606, 611–12 (6th Cir. 2009). This standard is meant to protect those consumers most in need of protection, that is, the "naive and the credulous," by looking at the representations from their vantage point. *See Clomon v. Jackson*, 988 F.2d 1314, 1319 (2d Cir. 1993). At the same time, however, it is an objective test, and it protects the debt collector from bizarre or idiosyncratic readings or understandings of communications made in the course of debt collection. *See id.*

A least sophisticated consumer could conclude from the complaint filed that non-payment of electric bills was a breach of the lease. Although Ohio law allows eviction actions to be premised on a breach of "an obligation imposed on [tenants] by a written rental agreement," Ohio Rev. Code § 1923.02(9), it is not at all clear in this case that simply being late in paying the electric bill was a breach of Ms. Nelson's lease. Unlike the sample lease that was made an exhibit to the agreement between Triangle and APL, Ms. Nelson's lease did not provide that the electric service could be charged to her as a part of her rent, nor that the failure timely to pay utility bills was a breach of the lease. Ms. Nelson's lease simply required her to "maintain" electric and water service. That language is susceptible of at least one reasonable construction in her favor, *i.e.* that she needed to do whatever was needed not to have such service discontinued. The eviction complaint does not allege a discontinuation of service, but rather lateness in payment. Thus, it could be viewed as deceptive by alleging that an action which is neither a breach of the lease nor a legitimate ground for commencing eviction proceedings is, in fact, both.

The same rationale extends to Ms. Nelson's allegation that the eviction actions contained a deceptive statement about the amount owed. Both actions were premised

upon past due amounts. Because the Court must accept the allegations of the complaint as true, the Court must credit Ms. Nelson's claim that these past due amounts included both charges for electric service provided to common areas of the apartment building and late fees in excess of $5.00. There is, at the pleadings stage of this case, some dispute about whether APL was entitled to these amounts, so that the allegation that the amount claimed as owed in the two eviction complaints overstated that amount, and was therefore false or deceptive, is plausible. Consequently, the Court concludes that Count One states a claim for relief under the FDCPA at least as it relates to the statements made in the course of APL's filing of the two eviction actions. *See Hartman*, 569 F.3d at 612 (finding potential FDCPA claims based on allegedly false and deceptive statements made in state court collections complaint).

IV.

In Count Two, Ms. Nelson alleges that the same actions taken by APL which underlie the FDCPA claim also violated the Ohio Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.01 *et seq*. In particular, she claims that these actions were unfair and deceptive, in violation of § 1345.02, or were unconscionable, in violation of § 1345.03. Those statutory sections prohibit, respectively, the commission of an "unfair or deceptive act or practice in connection with a consumer transaction" and the commission of "an unconscionable act or practice in connection with a consumer transaction." APL does not dispute that its supply of electric power to Ms. Nelson was a consumer transaction as defined in the OCSPA, but argues that the complaint does not adequately plead the commission of any unfair, deceptive, or unconscionable practice.

As an initial matter, as APL points out, Ms. Nelson makes a number of

arguments in her memorandum in opposition to the motion to dismiss about why APL violated the OCSPA which do not necessarily track the allegations contained in the second amended complaint. The Court agrees with APL that it must determine whether the allegations of the complaint state a claim, and not whether Ms. Nelson is able to articulate other potential claims under the OCSPA which she has not pleaded. The pleaded allegations are limited to the assertion that APL "provided sub-metering services that resulted in Ms. Nelson being charged excessive late fees and other unexplained charges," that it "used court processes not lawfully available to [it] to collect a debt," that it "never informed Ms. Nelson that [it] would use eviction actions to collect on her electric bills," and that in those eviction actions it "deceptively alleged ... that the electric bill sum was owed to her landlord, that Ms. Nelson's late payments of her electric bills were lease violations, and that she had failed to make such payments prior to the filings." (Second Am. Compl. ¶¶ 44–48.)

The Ohio Court of Appeals for the Third Appellate District described the workings of the OCSPA as follows:

> Although the CSPA uses the words "unfair" and "deceptive", "a consumer is not required to demonstrate that a supplier intended to be unfair or deceptive." *Frey*, 80 Ohio App.3d at 6, 608 N.E.2d 796 (citations omitted); *see also Meade v. Nelson Auto Group* (March 31, 1997), Union App. No. 14-96-45, unreported, 1997 WL 208685. "It is how the consumer views the act or statement which determines whether it is unfair or deceptive." *Frey*, 80 Ohio App. 3d at 6, 608 N.E.2d 796; *see also Meade, supra*. Consequently, "[i]f the supplier does or says something, regardless of intent, which has the likelihood of inducing in the mind of the consumer a belief which is not in accord with the facts, the act or statement is deceptive." *Frey*, 80 Ohio App. 3d at 6, 608 N.E.2d 796 (citation omitted); *see also Meade, supra*. "[T]he basic test is one of fairness as the act need not rise to the level of fraud, negligence or breach of contract." *Thompson v. Jim Dixon Lincoln Mercury, Inc.* (April 27, 1983), Butler App. No. 82-11-0109, unreported, 1983 WL 4353.

*Lump v. Best Door & Window, Inc.*, Nos. 8-01-09, 8-01-10, 2002 WL 462863 at *4 (Ohio App. 3 Dist. Mar. 27, 2002).  Applying that standard here, the Court concludes that at least some of the allegations contained in Count Two state a claim under the OCSPA.

As discussed above in connection with Ms. Nelson's claim under the Fair Debt Collections Practices Act, the Court must, for the moment, accept her representation that she was being charged for common area electric usage without her knowledge, that the late fees being assessed against her exceeded those permitted under the terms of her agreement with APL, and that APL had no legal right to add attorneys' fees or court costs to her electric bill.  The Court must also accept as true her allegation that the amounts claimed in the eviction actions to be due for electrical service included these charges, and it has concluded that there is a plausible theory under which Ms. Nelson could prove that her failure to pay her electric bills in a timely fashion did not rise to the level of a breach of the lease, which only required her to "maintain" electric service to her apartment.  Thus, she has alleged a number of statements made by APL in connection with the consumer transaction in which she and APL were involved that had a likelihood of inducing in a consumer a false belief, which is all that is needed in order for such statements to come within the statutory meaning of a deceptive act.

The Court has already rejected one of APL's arguments about these allegations, namely that Ms. Nelson will not be able to disprove APL's assertion that her late payment of electric bills was a breach of the lease.  In support of its argument on this issue, and as part of its request that the Court dismiss the OCSPA claim, APL cites to *Sandefur Management Co. v. Wilson*, 21 Ohio App. 3d 160 (10 Dist. 1985), as standing

for the proposition that language in a rental agreement requiring a tenant to maintain electrical service encompasses a mere failure timely to pay for that service. Although the *Sandefur* court described the lease terms as obligating the tenant to maintain electrical service, and the referee had found, at the trial court level, that "the payment of the electric utility expense is an obligation imposed upon a tenant by . . . the lease at issue," *see id*. at 161, the appeals court did not decide whether that interpretation of the lease was correct. Rather, in that case, there was an actual termination of electrical service due to non-payment of the bills, and the issue raised on appeal was whether the landlord was required to provide the tenant with thirty days' notice and an opportunity to cure the breach before evicting the tenant. As the court also observed, "[t]he alleged violation at all times throughout [the proceedings] was that [the tenant] had failed to maintain electrical service, thereby permitting the plumbing in the building to freeze." *Id*. at 163. Thus, *Sandefur* simply cannot be read as foreclosing Ms. Nelson's argument that she did not breach her lease by not paying her bills in a timely fashion, and that any statement to the contrary can be viewed as deceptive or misleading.

The Court does agree with APL, however, that there is nothing deceptive about APL's use of the eviction process itself which would violate the OCSPA. APL filed the eviction complaint in REC's name, an action permitted by REC's agreement with APL, and REC is the party with standing to pursue an eviction. Because REC had authorized the use of its name in connection with the eviction proceedings, the mere filing of a complaint alleging that REC was the party pursuing eviction could not have constituted a deceptive or misleading statement or practice. Similarly, the failure to advise Ms.

Nelson that APL was permitted to file an eviction action under REC's name for breach of the lease cannot be viewed as deceptive. No contrary statement was ever made, and, in fact, had Ms. Nelson been told that she could not be forced to defend an eviction action arising out of her non-payment of electric bills, that would have been false. Thus, those allegations of Count Two that relate solely to APL's filing of an eviction action under REC's name (as opposed to the statements made in the eviction complaints themselves) do not state a claim under the OCSPA.

## V.

Count Three asserts a claim for common-law fraud. The elements of such a claim under Ohio law are well-known. A party commits an actionable fraud if that party makes a false representation about a fact material to the transaction at hand, or omits to state material facts despite a duty to do so; there is an intent to mislead the other party to the transaction; the other party justifiably relies on the material misrepresentation or non-disclosure; and that party then suffers injury. *See Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343, 352 (6th Cir. 2000) (citing *Burr v. Bd. of County Comm'rs of Stark Co.*, 23 Ohio St. 3d 69 (1986)). Unlike her first two claims, Ms. Nelson has confined her fraud allegation to a single instance of non-disclosure. She asserts that both APL and Green Eagle had a duty to tell her that APL believed that it had the authority to file an eviction action against her for simple non-payment of electric bills, and that the failure to advise her about that belief was material to her decision to sign her June 1, 2006 lease. The injury she identifies as resulting from this alleged material non-disclosure is the filing of the eviction actions, and her incurring expense in defending against them.

APL's primary argument in support of its motion to dismiss this claim is that the law imposed no duty on APL to make any disclosures to Ms. Nelson in connection with her decision to sign the June 1, 2006 lease. It contends that it had no fiduciary relationship or other relationship of trust with her, and that absent such a relationship, Ohio law imposes no duty to speak. In response, Ms. Nelson contends that a duty to disclose can arise not only in the course of a relationship of trust or confidence, but any time that the failure to disclose creates a foreseeable risk of harm. The Court concludes that APL has the better of this argument.

The two cases which Ms. Nelson cites in support of her position, *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St. 3d 677 (1998) and *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St. 3d 75 (1984), are both personal injury negligence cases. Each of them speaks not to the duty to disclose facts, but the duty to exercise due care to avoid foreseeable injury. In that context, it is certainly true that a party has a duty to exercise reasonable care, but that is a far cry from implying a duty to speak when it is foreseeable that silence might result in injury. As Ohio federal courts have long recognized, silence, even in the face of foreseeable injury, is not actionable unless there is a fiduciary or quasi-fiduciary relationship between the parties which mandates full disclosure. *See Connelly v. Balkwill*, 174 F. Supp. 49, 56 (N.D. Ohio 1959) ("It has long been the rule in Ohio that . . . , generally speaking, mere silence does not amount to fraud . . . ."); *see also Hayes v. Computer Assocs. Intern., Inc.*, No. 3:02CV7452, 2003 WL 21478930, at *5 (N.D. Ohio June 24, 2003) (acknowledging the general rule and noting that "[t]he duty to disclose arises in situations where one party has information that the other party is entitled to know because of a fiduciary or other similar

relation of trust and confidence between them").

Ohio law is quite clear on this point.  While a strict fiduciary relationship is not required in order to trigger the duty to speak, that duty does not arise in the course of an ordinary arms-length business transaction.  Thus, although "[a] person's duty to speak does not necessarily depend on the existence of a fiduciary relationship," there must be some evidence or allegation of a "'situation where one party imposes confidence in the other because of that person's position, and the other person knows of this confidence.'" *Leal v. Holtvogt*, 123 Ohio App. 3d 51, 76 (2 Dist. 1998) (quoting *Mancini v. Gorick*, 41 Ohio App. 3d 373, 374–75 (9 Dist. 1987)); *see also Fed. Mgt. Co. v. Coopers & Lybrand*, 137 Ohio App. 3d 366, 383–84 (10 Dist. 2000) (citing, *inter alia*, *State v. Warner*, 55 Ohio St. 3d 31, 53 (1990) (stating that "a duty to disclose arises primarily in a situation involving a fiduciary or other similar relationship of trust or confidence.")  As the Franklin County Court of Appeals has also explained, "[g]enerally, when parties act to protect their own interests and operate at arm's-length from one another, their relationship is not fiduciary in nature." *Carnahan v. SCI Ohio Funeral Servs., Inc.*, No. 00AP-490, 2001 WL 242555, *5 (Ohio App. 10 Dist. Mar. 13, 2001).

Here, APL was not even a party to the June 1, 2006 lease.  Further, there is no allegation in the complaint that Ms. Nelson and APL were anything but parties to an arms-length business transaction, with their relationship being that of consumer to supplier.  In that relationship, each party is ordinarily advancing his or her own interests, and not undertaking some special duty for the benefit of the other.  This type of commercial relationship, not preceded by any prior relationship of trust or confidence between the parties, does not give rise to any duty to disclose which can support a

fraud claim. *Cf. Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 571 (6th Cir. 2003) (construing Tennessee law). In short, there is no plausible basis for any claim that, with regard to the lease at issue, APL and Ms. Nelson stood in some type of relationship which, as a matter of law, obliged APL to disclose any information to Ms. Nelson before she signed the lease. Thus, her fraud claim against APL is properly subject to dismissal.

## VI.

In her fourth claim, Ms. Nelson alleges that APL's filing of the two eviction actions constituted the tort of abuse of process. She pleads that although the actions were brought "in proper form," that is, in the name of her landlord or its agent, the true purpose of the actions was not to obtain a judgment evicting her from the premises, but to coerce her into paying her electric bill. Thus, she contends that APL's use of the courts in this way was an actionable abuse of process.

Both parties agree that the elements of an abuse of process claim under Ohio law are correctly set forth in *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 68 Ohio St. 3d 294 (1994). Those elements are "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process." *Id.* at 298. APL argues that Ms. Nelson's allegations do not, despite her having pleaded the conclusion that the cases were filed "in proper form," satisfy the first of these three elements because she has also claimed that the actions were not filed in proper form, *i.e.* that they were improperly filed from the start because APL was not her landlord and

had no standing to sue her in an eviction action for late payment of electric bills. In response, Ms. Nelson claims that the "in proper form" element is satisfied by her allegation that the name of the plaintiff and the form of action—eviction for alleged breach of the lease—were both proper, and that the improprieties occurred with respect to the second element of this tort because APL perverted the proceedings by attempting to achieve a result—payment of the electric bills—that the court, in an eviction action, was powerless to award.

It is fair to say that there is not an overwhelming body of case law in Ohio concerning this element of the tort. In general, however, the cases appear to support the proposition that this element is satisfied by an allegation that the lawsuit that forms the basis for the claim was "lawfully brought," or, stated differently, that "probable cause was initially present to bring . . . suit . . . ." *See Hershey v. Edelman*, No. 09AP-400, ---N.E.2d ----, 2010 WL 1820213, at *7 (Ohio. App. 10 Dist. May 6, 2010). While other allegations in the complaint would appear to support APL's argument that Ms. Nelson disputes the presence of probable cause to bring either action—and she does plead, in other counts, that there was no basis for APL's claims either that she owed the amount pleaded or that she breached her lease—this case is at the pleadings stage. Ohio courts consistently recognize a plaintiff's ability to plead claims in the alternative. *See, e.g. Dever v. Lucas*, 174 Ohio App. 3d 725, 733–34 (5 Dist. 2008). Further, APL's arguments create a plausible basis for the first element this claim; it has consistently contended that the eviction actions properly pleaded a cause of action for breach of the lease, so that they were commenced with probable cause. If that ultimately turns out to be the case, many of Ms. Nelson's other claims would fail, but the abuse of process

claim would survive a challenge to whether the first element has been satisfied (and APL's motion does not address the remaining two elements). Under these circumstances, the motion to dismiss Count Four is not well-taken.

### VII.

Count Five of the complaint pleads a claim for civil conspiracy. According to that count, APL and Green Eagle entered into an agreement to commit various tortious acts, "including abuse of the eviction process and fraud." (Second Am. Compl. ¶ 74.) In moving to dismiss this count, APL relies on a single argument: that because "Plaintiff's only alleged tort claims—fraud and abuse of process—cannot support the conspiracy claim, as Plaintiff has failed to state a claim for either against any of the Defendants." (APL's Motion to Dismiss (Doc. 58) at 13.) Thus, APL's motion to dismiss the civil conspiracy claim rises or falls with the Court's determination of whether the complaint adequately pleads other tort claims against the defendants.

As set forth above, although the Court agrees that no actionable fraud has been pleaded, the Court has concluded that Count Four states a claim for the tort of abuse of process. Because this claim survives, the premise of APL's motion to dismiss Count Five is undercut, and that count survives as well.

### VIII.

Count Six of the complaint is a claim for unjust enrichment. In that count, Ms. Nelson claims that she made three types of payments to APL that were not within the scope of the parties' contract—for common area electric use, for late fees in excess of $5.00, and for attorneys' fees and court costs. Again, the Court must accept these factual allegations as true, and APL does the same in its motion. Countering Ms.

Nelson's claim that it has been unjustly enriched by the retention of these payments, APL contends that because the payments were made voluntarily, Ms. Nelson may not now claim an entitlement to reimbursement under an unjust enrichment theory.

As support for its argument that the voluntary payment of an amount not legally owed to another waives any unjust enrichment claim, APL relies heavily upon the explanation of this doctrine contained in *Scott v. Fairbanks Capital Corp.*, 284 F. Supp. 2d 880 (S.D. Ohio 2003). That case involved initially a claim by residential mortgagors that their mortgage lender was improperly attempting to collect attorneys' fees which the lender incurred in mortgage foreclosure proceedings despite the fact that such charges are prohibited by Ohio law. Plaintiffs then sought to amend the complaint to include a claim that the lender had collected "padded charges" consisting of funds advanced on the borrowers' behalf, property inspection fees, other unspecified fees, and certain unpaid charges, when the lender provided a payoff figure in connection with the reinstatement of the loan following default or in connection with the sale of the property. One of the six arguments advanced by the lender in opposition to the motion to amend was that the plaintiffs' payment of these fees waived any legal entitlement to their return under the "voluntary payment" doctrine.

The Court, per Judge Rice, noted, in connection with the "voluntary payment" argument, that "Ohio recognizes that doctrine" and that "'[i]n the absence of fraud, duress, compulsion or mistake of fact, money, voluntarily paid by one person to another on a claim of right to such payment, cannot be recovered merely because the person who made the payment mistook the law as to his liability to pay." *Scott*, 284 F. Supp. 2d at 894 (quoting *State ex rel. Dickman v. Defenbacher*, 151 Ohio St. 391, 395 (1949)).

However, the Court refused to use the doctrine to deny the plaintiffs' motion for leave to amend, holding, first, that it had no application to claims brought under federal law such as the Fair Debt Collection Practices Act, and, second, that any issues about whether the payments were truly voluntary and made by a party in full possession of all of the facts surrounding the payments should "be raised in a subsequent motion to dismiss or for summary judgment." *Id.* at 895.

Recognizing that Ms. Nelson has asserted that it collected different types of charges to which it had no legal right, APL advances different arguments as to each. Regarding late fees, APL contends that these were clearly disclosed on the face of the bills, so that Ms. Nelson had to have been aware of their nature and amount and also aware that they differed from the $5.00 late fee which the billing statement said would be charged in the event of late payment. With regard to the amounts added for attorneys' fees and costs, APL argues that Ms. Nelson's knowledge of the nature of these fees is established by "her own allegations," particularly those contained in ¶¶ 28 and 31 of the second amended complaint. (APL's Mot. to Dismiss (Doc. 58) at 15-16.) Alternatively, it argues that once the fees were assessed, even if their nature was not clearly identified, if Ms. Nelson wanted additional information about them she should have asked for it before paying the bills containing those charges. APL does not, however, address the claim concerning charges for common area electric usage, and has advanced no basis under which that portion of the unjust enrichment claim could be dismissed.

Ms. Nelson's response to the motion to dismiss does not treat any of these payments separately, but rather argues that it would be premature to decide the issue

in the context of a motion to dismiss because she has alleged fraud, illegality, and bad faith, and it remains to be seen whether she can prove any of these bases for circumventing the voluntary payment argument. She also cites to *Arlington Video Prods, Inc. v. Fifth Third Bancorp*, No. 2:08-cv-122, 2008 WL 1990355 (S.D. Ohio May 1, 2008), as authority for the proposition that such an issue should not ordinarily be resolved in the context of a motion to dismiss. *Arlington Video* involved, *inter alia*, a claim for unjust enrichment relating to allegedly unauthorized bank fees charged to depositors. This Court, per Judge Graham, agreed with the plaintiff in that case that the issue raised by the motion to dismiss was, fundamentally, whether the depositor made the payments with full knowledge of the facts, and that "it would be premature, at this stage, to conclude that Plaintiff voluntarily made the payments at issue to defendant with full knowledge of the facts." *Id.* at *6. The Court thus deferred the issue "pending further factual development of the record." *Id.*

Taking the two remaining categories of payments in reverse order, the Court agrees with Ms. Nelson that it is premature to conclude, based simply upon the pleadings and the additional electric bills submitted by APL, that Ms. Nelson had full knowledge of the facts surrounding the addition of charges for attorneys' fees and costs to her electric bill. APL certainly made no effort to explain the nature of those charges to her; they are not itemized on the bills, but simply appear as unexplained increases in the amount due from the prior bill. The allegations of ¶s 28 and 31 of the second amended complaint do not conclusively establish that, at the time she paid these bills, Ms. Nelson knew what she had been charged for; those averments establish, at most, that with the benefit of hindsight, Ms. Nelson now believes that the charges represented

attorneys' fees and costs, but not that she knew it at the time.

APL's claim that Ms. Nelson cannot claim unjust enrichment as to these amounts because she failed reasonably to investigate the nature of the charges fares no better. The only authority cited for that argument consists of two decisions from an intermediate appellate court in Illinois. The more recent case, *Harris v. ChartOne*, 362 Ill. App. 3d 878 (2005), is inapposite because the bills at issue in that case did itemize the fees being charged and gave the plaintiffs "enough information to determine whether there was a basis to protest or at least to investigate the exact factual basis for the charges." *Id.* at 882. Here, by contrast, absolutely no explanation was given. Thus, it is at least plausible that Ms. Nelson can prove that she did not have enough information about these charges to undertake an investigation, at least in the time frame involved, which included her need not to have her electricity shut off in the winter months. The other case, *Goldstein Oil Co. v. Cook County*, 156 Ill. App. 3d 180 (1987), involved a different doctrine, the "voluntary payment of taxes doctrine," *see id.* at 182, and held that "[w]here a taxpayer makes no effort to ascertain the factual basis for the tax but pays it anyway, it is legally irrelevant if it later discovers information which may have negated its liability." *Id.* at 186. Obviously, that holding has little relevance to cases which do not involve tax payments. Thus, as to the attorneys' fees charges, there are, at this stage of the case, open factual issues about the extent of Ms. Nelson's knowledge of the basis of those charges and the reasonableness of her failure to question the bills before paying them. These issues preclude disposing of this particular unjust enrichment claim in the context of a Rule 12(b)(6) motion.

The claim concerning late fees stands on a different footing, however. The

electric bills sent to Ms. Nelson, and paid by her, consistently and clearly showed that she was being assessed late charges which exceeded $5.00. There is no question that she eventually paid all of these bills. She has not alleged any lack of knowledge of the nature or amount of these charges, or that she was somehow unaware that they exceeded the $5.00 which, according to her interpretation of the parties' contractual arrangement, was the maximum late charge which could be assessed. The Court has concluded that she has not stated a valid claim for fraud which might excuse or explain her seemingly voluntary payment of these charges. She has neither pleaded nor argued any specific facts from which the Court (or a jury) could conclude that she paid such charges only under coercion or duress. Consequently, although these fees may not have been authorized by the contract, and the assessment of them may form the basis for other legal claims, the Court concludes that Ms. Nelson may not maintain an unjust enrichment claim as to these particular fees, and that portion of Count Six will be dismissed.

### IX.

Finally, the Court must address REC's motion to dismiss APL's third-party complaint. In its motion, REC asserts, correctly, that the purpose of a third-party complaint is to allow a defendant to seek complete or partial indemnification for sums which the defendant may be required to pay if the defendant is found liable to the plaintiff. See Fed. R. Civ. P. 14. REC claims that no legal relationship exists between it and APL upon which an indemnity claim can be based, so that the third-party complaint must be dismissed for failure to state a claim.

The current third-party complaint, Doc. 63, alleges in its preamble that if Ms.

Nelson does recover against APL on any of her claims, that recovery would be based on "the active and primary fault, breach of contract, and/or errors and omissions of REC." *Id.* ¶ 5. However, the only count of the third-party complaint, Count One, predicates REC's duty to indemnify and hold harmless APL on an agreement between the parties. Although that agreement was not attached to the third-party complaint, it appears to be the same agreement pursuant to which APL was entitled to file eviction actions in REC's name and which has been discussed extensively in connection with the motion to dismiss the second amended complaint. In its response to the motion to dismiss, APL argues that it has pleaded a claim not only for express indemnity based on this agreement, but a claim for implied indemnity based upon the parties' contractual relationship. In response, REC points out that the agreement which forms the basis for APL's express and implied claims for indemnity was made between APL and Triangle Properties, and there is no allegation nor explanation of why REC should be considered a party to that contract or bound by its terms.

REC is correct that the contract at issue, which APL agrees that the Court may consider in ruling on the motion to dismiss, identifies the parties to the contract as American Power & Light, LLC and Triangle Properties, Inc. That agreement allows APL to bring eviction actions in the name of "Owner," *i.e.* Triangle Properties. Ms. Nelson's complaint alleges that Green Eagle is now the owner of the property in question, and that REC simply serves as Green Eagle's leasing agent. (Second Am. Compl. ¶ 3.) APL does not make any contrary allegations. In addition, it is black-letter law that an agent cannot be held liable for actions taken on behalf of a disclosed principal which are contractual in nature. *See, e.g., Stryker Farms Exch. v. Mytczynskyj*, 129 Ohio

App. 3d 338, 342 (6 Dist. 1998) ("An agent for a disclosed principal, acting within the scope of his authority and in the name of the principal, may not ordinarily be held personally liable") (citing *Dobell v. Koch*, 16 Ohio App. 41, 43 (1 Dist. 1921). Thus, APL has not alleged a viable contract-based indemnification claim against REC, nor has it identified any action taken by REC which would give rise to any other type of indemnification claim. Similarly, although APL has requested that it be given leave to file another amended third-party complaint against REC if the Court finds the current pleading deficient, APL has not identified any basis for an amended claim nor suggested how it might cure these deficiencies. Thus, given the current state of the record, there is no basis to grant that request.

## X.

Based on the above analysis, APL's motion to dismiss the second amended complaint (Doc. 58) is **GRANTED IN PART AND DENIED IN PART**. The Court **DISMISSES**, as against APL only, any claim in Count One under the FDCPA that does not relate to the statements made by APL in the course of APL's filing of the two eviction actions described in that Count; **DISMISSES** those allegations of Count Two that relate solely to APL's filing of an eviction action under REC's name; **DISMISSES** Count Three (the fraud claim); and **DISMISSES** that portion of Count Six that relates to payment of late charges. The Court **GRANTS** REC's motion (Doc. 66) to dismiss the

amended third-party complaint.  That complaint is **DISMISSED**, and APL's alternative request to amend the amended third-party complaint is **DENIED**.

IT IS SO ORDERED.

**MICHAEL H. WATSON**
**United States District Court**